# EXHIBIT 1

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT, IN AND FOR
MIAMI DADE COUNTY, FLORIDA.

CIVIL DIVISION

CASE NO.  2019-35660-CA-1

LAKE HOLDING & FINANCE S.A.,

          Plaintiff,

vs.

MIKHAIL BORISOVICH BELIAK,
MARGARITA BELIAK, ANASTASIA
BELIAK, MB WALL LLC,
MD PDT 1901 LLC, MFCVSSAR LP,
MFCVSSAR GP, JOHN AND JANE DOES 1
THROUGH 100, JOHN DOE CORPORATIONS
1 THROUGH 100, and OTHER JOHN DOE
ENTITIES 1 THROUGH 100, all whose true names
are unknown,

          Defendants.

_____/

## DECLARATION IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND IN SUPPORT OF LAKE HOLDING'S MOTION FOR PROCEEDINGS SUPPLEMENTARY

      I, Vladimir Vasilyevich Melnichenko, pursuant to Florida Statute § 92.525 and

under penalty of perjury, declare as follows:

    1.  I am over twenty-one (21) years of age and am fully competent to make this

declaration.

    2.  I am the sole beneficial owner of Lake Holdings & Finance S.A. (**"Lake Holding"**),

the Plaintiff herein, and I am duly authorised to make this declaration on behalf of Lake

Holding. The facts and matters herein are, save where otherwise stated, within my own

knowledge and derived from:

    (a) Information and documents provided by Mikhail Borisovich Belyak (**"Mr. Belyak"**)

1

and Mr. Igor Garrievich Rempel (**"Mr. Rempel"**) or others on their behalf.

(b) Evidence discovered in Cyprus, Russia, USA, France, Monaco, the British Virgin Islands (**"the BVI"**), Canada and Belize.

I am informed that copies of my Cyprus affidavit dated March 10, 2020 have been filed herein at Docket No. 51. The proceedings in Cyprus against Mr. Belyak have been brought to enforce the Russian Judgments against him and for other relief sought against entities connected with him and his daughter, Anastasia Belyak (**"Anastasia"**). I confirm and adopt the contents of that affidavit. The paragraphs below contain a shorter summary of relevant facts.

3.    Lake Holding is a company established in the British Virgin Islands with registration number 590903 beneficially owned by me. I am a Russian national and businessman and I have worked in the Russian coal mining industry, and real estate business. The rest of my background is described in my affidavit sworn on March 10, 2020 in the Cyprus action against Mr. Belyak and others. *See* Dkt. No. 51.

4.    I submit this declaration in opposition to the Defendants' motions to dismiss (**"MTDs"**) the Amended Complaint asserting claims for constructive trust, unjust enrichment, alter ego liability, fraudulent conveyance, among others (Case No. 19-035660-CA-01 (44) (the "Fraudulent Transfer Action"). I have read a copy of the final draft of the declaration to be made by George Benaur (**"Mr. Benaur"**), the contents of which I agree and endorse. I adopt some of his abbreviations.

5.    Before continuing, I emphasise in the strongest possible terms that I am giving an historical account of my dealings with and the behaviour of Mr. Belyak (and to some extent with Mr. Rempel) simply to describe the manner in which he has operated as a principal, through other physical persons and entities (especially relatives), and how this *modus operandi* is of great relevance to the approach to the Florida real estate at issue in this

action, which the Belyak defendants claim belongs to anyone **except** Mr. Belyak himself. The Belyak defendants maintain that Lake Holding is asserting claims that fall to be determined under the dispute resolution provisions of the loan agreements and guarantees pursuant to which the Russian Judgments were entered. That is quite wrong. I do not ask this Court to grant any form of relief based on anything relating, for example, to past discussions, attempts to reach settlements or actual settlements. Lake Holding simply asks the Court to make orders under Florida law as to the availability of the Florida real estate to satisfy this Court's judgment dated October 6, 2020. In so doing, I request that the Court should have regard to Mr. Belyak's well established *modus operandi.*

6. Lake Holding is not seeking damages in respect of the dishonest manipulations described by Mr. Benaur or in this declaration. It seeks to enforce the Russian Judgments in respect of Belyak's guarantee liabilities, now converted into a Florida judgment. Lake Holding explains the conduct which has taken place in respect of, for example, Terton, Carmen and Prosperity etc (as defined by Mr. Benaur) as "similar fact evidence" so that the Court will disbelieve the claims that Belyak is not the true owner of the Florida real estate. Manipulations of ownership by Belyak seem to have been an obsession and no secret was made of this in the February 2010 agreement referred to by Mr. Benaur and by me below. Secrecy seems to have become even more important after the defaults at the end of September 2014 and, when he was interviewed by the Russian Federal Bailiff Service (**"the RFBS"**) in 2018 and 2019, Mr. Belyak denied that he and his wife held any assets outside Russia and he stated that he did not know if Anastasia did.

7. Although Mr. Belyak and Mr. Rempel were involved in several joint ventures in their business empire, it is clear that **their interests were held and managed separately**. This is demonstrated by the charts and other documents exhibited to Mr. Benaur's declaration, especially at the uppermost levels. *See* the Charts referred to in paragraphs 39

and 40 below. After the defaults, Mr. Belyak's interests were represented by Anastasia (and others) using various companies described by Mr. Benaur. (Mr. Rempel's interests were held and managed through Garri, his father, and others. There was little or no overlap.)

8.   The Belyaks and their entities have sought to argue that Mr. Rempel is an indispensable party to the proceedings to enforce the judgments against Mr. Belyak on the Florida real estate. This is totally wrong – indeed absurd. Whatever Rempel has done to avoid the execution of judgments against **his property**, or whatever he did or did not do (with or without Belyak) in the period prior to the entry of final and enforceable Russian judgments has nothing to do with the issues which this Court must decide. Lake Holding now has a final Florida judgment dated October 6, 2020 and on October 13, 2020 the Court of Appeal refused to grant a stay. The court at first instance now has to determine whether the Florida real estate is property belonging to Belyak against which the Florida judgment can be executed. The history in Russia is irrelevant, save that Belyak's dishonest conduct (and the deliberate complexity of the ownership structures he has used) should guide the court in deciding whether or not to believe him, his wife and his daughter. Rempel has no part to play in this.

9.   I also mention that the historical account in paragraphs 11 to 51 below concentrates attention on the period between the defaults on September 30, 2014 and the end of 2016 because the Florida entities were created and the Florida real estate was purchased in 2015 and 2016 during a time when both Mr. Belyak and Mr. Rempel were "pleading poverty" as a reason why they and BTR were in default, why BTR was only making sporadic payments (less than the sums which the loan agreements required) and why they could make none.

10.  In paragraph 55 below, I give a detailed chronology of the formation of the Belyak entities and the purchases of real estate. *See* also Benaur Decl. ¶¶ 11 to 17.  In addition, I insert between paragraphs 11 to 51 below some short references to events relating to the real

4

estate purchases in 2015 and 2016 which are recounted more fully in paragraph 56. These appear in paragraphs in bold italics.

11.  Since 2010, I have had a close business relationship with Mr. Belyak (and Mr. Rempel). Our business relationship started when they approached me with a proposal to invest 33.3% in "Unimall" – a shopping mall outside Moscow, Russia controlled by them (currently owned by Baltia Mall LLC ("**Baltia Mall**")). This was our very first business relationship and it amounted to a joint venture which was based on and/or gave rise to obligations of trust and mutual respect.

12.  Through Lake Holding, in the period 2012 to 2014, I lent a total of US$ 90 million to BTR Build To Rent Group Limited ("**BTR**" – a Cyprus company stated by Mr. Belyak and Mr. Rempel to be owned and controlled by them[1]). Mr. Belyak (and Mr. Rempel) volunteered to give personal guarantees when the lending was increased, and the term of the loans was extended. BTR, Mr. Belyak and Mr. Rempel all defaulted on their loan and guarantee obligations at the end of September 2014 and, to cut a long story short, Lake Holding obtained final and enforceable Russian judgments against them in various Russian proceedings between 2017 and 2020. The judgments obtained against Mr. Belyak have been domesticated in a judgment of this Court issued on October 6, 2020.

13.  Mr. Belyak and Mr. Rempel each own and control many entities and physical persons and they boasted of this in discussions with me from time to time, especially to encourage me to make the loan advances referred to above. Their manner of separate ownership and control through other entities and physical persons seems to have been employed well before the defaults on the loan and guarantee obligations which took place in

---

[1] It must be noted that, prior to February 12, 2019, from June 13, 2007 to March 10, 2017, Mr. Belyak and Mr.Rempel owned BTR through **separate BVI companies** (Terton Alliance Limited and Sharleen Global Intertrade Inc) and from March 10, 2017 to February 12, 2019 through Anastasia and Garri (daughter and father respectively). On February 12, 2019, the professional nominee company, Plantrust Services Limited **of Cyprus**, became the sole shareholder in BTR, no doubt under trust agreements with the real owners, Mr. Belyak and Mr. Rempel.

5

September 2014.

14. By February 2010 at the latest, Mr. Belyak had already designed the structures of his own empire to make life difficult for those intending to attack them. However, after the defaults in September 2014 referred to herein, both Mr. Belyak and Mr. Rempel engaged in manipulations of asset ownership and control and fraudulent transactions (often in different ways) which were calculated to immunise assets from attempts to recover the debt including the execution of the judgments which Lake Holding obtained. Investigations have shown that Mr. Belyak and Mr. Rempel each kept the control of their Russian real estate assets outside Russia through, inter alia, companies in the BVI and Cyprus. Separately, it seems that Mr. Rempel has used at least two companies based in each of Belize and the Seychelles. They also hid assets outside Russia, in France, Monaco and the USA and lied about having such assets, and even about the offshore control of their Russian assets (in the BVI and Cyprus), when questioned by the Russian Federal Bailiff Service (**"RFBS"**). It is clear that the ownership structures require **separate analysis**.

15. As part of the investment in Unimall, I agreed to enter into an "Agreement of Intent" dated February 18, 2010 (**"the February 2010 agreement"**). A copy of the agreement together with its English translation is hereto attached as **Exhibit 1.** Several important points emerge from the February 2010 agreement:

(a) Reflecting the reality of the situation as presented, Mr. Belyak and Mr. Rempel entered into the February 2010 agreement personally, as the principals. They later entered into various further agreements as principals.

(b) BTR, is defined in paragraph 1 but the next definition is of the "BTR Group" and against that term this is written:

*"means I.G. Rempel, M.B. Belyak, as well as individuals and legal entities controlled by them"*

6

Although I was well aware, by this stage, that Mr. Belyak and Mr. Rempel were the masters of the business partnership, not to say empire, which they had assembled, this definition made it plain that they enjoyed the benefits and bore the burdens of the BTR Group as its owners and controllers. Furthermore, it is clearly stated that the Group extends to **entities** and **persons** controlled by them separately. Indeed, Mr. Belyak and Mr. Rempel informed me that they were – and I believe that they still are – the persons at the centre of a web of their business interests. When I saw the charts given to me in the Fall of 2015, it was clear that each had different ownership structures and vehicles.

(c) The February 2010 agreement was intended to be the pre-cursor to further business cooperation between myself and Mr. Belyak and Mr. Rempel, as individuals as well as through the "BTR Group". Clause 2.2 provides:

*"The parties agreed that Mr Melnichenko has a preemptive right to participate as an investor in all projects carried out by BTR Group."*

16. This applied to projects carried out by Mr. Rempel and Mr. Belyak and by individuals and legal entities controlled by them. They therefore laid down a very large marker that they controlled their business interests indirectly through entities and physical persons as well as directly.

17. Despite the fact that the shares in Baltia Mall were sold from what appears to have been a specially incorporated Cyprus company called Stretkato Trading Limited (**"STL"**), Mr. Belyak and Mr. Rempel were the ultimate beneficial owners / real contracting parties and it was for that reason that they provided personal guarantees in the context of the sale of the shares, effectively making themselves parties as vendors. This clearly indicated that, as with other companies and businesses, they owned and controlled assets which had been placed in the hands of a third party (in order to appear that they did not own the assets) but they then

exposed themselves by providing personal guarantees. This is what was exactly happened in the case of the lending by Lake Holding. The guarantees of STL's obligations dated August 10, 2010 are attached, together with their English translations, as **Exhibit 2**.

18. STL was incorporated on February 11, 2010 – 7 days before the February 2010 agreement. Its director was Dmitri Kim – a person closely connected to Mr. Rempel. As appears below, STL had obvious connections to Mr. Belyak and Mr. Rempel

19. The shareholders of STL were Clevedon Management Limited (**"Clevedon"** - connected to Mr. Rempel) and Sargent Alliance Limited (**"Sargent"** - connected to Mr. Belyak), both of the BVI. Copies of key information from BVI company searches on these two companies is attached as **Exhibit 3**.

20. Clevedon was incorporated on 19 May 2009, struck off on 1 November 2016 and the service provider, Mossack Fonseca & Co (BVI) Limited (**"Mossack"**), gave 90 days' notice of resigning on March 16, 2017. Unusually for a BVI company, Lake Holding learned of the identity of the director through the resignation letter shown in the search result. That letter is addressed to Larisa Rempel, Russian Federation, Moscow Region, Odintsovskiy Ragon, Pos. Lesnoy, Gorodock, UL, Shkolnaya, D.4. This lady is Mr Rempel's mother and the wife of Garri Rempel (**"Garri"**), Mr Rempel's father who Lake Holding maintains was installed as nominee for his son in respect of several Cyprus and BVI companies. One of the filed BVI forms shows the email address for the director as IrynaR@unitrust.ca, i.e. at Unitrust Corporate Services Limited (now known at Santorini Global Limited – but called **"Unitrust"** herein) near Toronto, Canada. Unitrust has been discovered (in documents disclosed by order in the BVI) to be the entity to which Commonwealth Trust Limited (BVI) reported in respect of the Belyak and/or Rempel BVI companies Belleview United Corp, Kendalmac Services Limited (**"Kendalmac"**) and Terton Alliance Limited.

8

21. Sargent was incorporated on January 22, 2009, struck off on November 1, 2017 and Mossack gave 90 days' notice to resign on March 15, 2017. Again, unusually for a BVI company, Lake Holding learned about the director through the resignation letter. That letter is addressed to Artem Eranov, Generala Karbysheva Boulevard, Building 16, Apt 76, Moscow (he is Mr. Belyak's nephew). One of the filed BVI forms shows the email address for the director, yet again, as IrynaR@unitrust.ca, i.e. at Unitrust (see the details mentioned above).

22. Furthermore, Lake Holding has researched "Offshore Leaks" which is said to be current to 2015. The information is based on the material leaked in the "Panama Papers" and it appears to be quite accurate based on the corroborating information in the BVI searches. Lake Holding searched "Offshore Leaks" for Clevedon, Sargent, Larisa Rempel, Igor Rempel, Amastasia (sic) Belyak and Artem Eranov – see the attached PDFs in **Exhibit 4**. There are sufficient similarities between information about Clevedon and Sargent in the BVI searches (e.g. Unitrust details and the names of the directors) to make the Offshore Leaks information credible. On the basis of this information it is the position of Lake Holding that, aside from the personal guarantees, the documents establish links from STL through Clevedon and Sargent to Mr. Belyak and Mr. Rempel, directly and/or by virtue of relatives.

23. Before mentioning some further matters that tie Mr. Belyak (as well as Mr. Rempel) very firmly to BTR and other entities, I must identify Vitali Dementyev (**"Mr. Dementyev"**), who was presented to me as their business representative and the representative of entities and persons controlled by them. Although I have dealt extensively with Mr. Belyak and Mr. Rempel personally, there were email exchanges between (*inter alia*) Mr. Dementyev and myself to which I shall refer below. Mr. Dementyev was officially employed by Baltia Mall and/or an other entity of BTR Group but, in any event, his email address was shown, at all relevant times, as *vdem@btr-group.ru*, i.e. it was an email address at BTR itself.

9

24. There is also no doubt in my mind that he took instructions from Mr. Belyak and Mr. Rempel and what he said and wrote confirms that.

25. In an email exchange on July 23 and 24, 2012, between Mr. Dementyev and myself, which is attached together with its English translations as **Exhibit 5**, there was a request by Mr. Dementyev on behalf of Mr. Belyak and Mr. Rempel that the loan being discussed should be made by a company on my behalf to a company owned by them. Mr. Dementyev explained that this would be advantageous from a tax point of view and he also said:

*"Pledging share owned by a company, even if non-resident, in our opinion can be executed and notarised without any delays. IGR and MBB* [i.e. Mr. Rempel and Mr. Belyak] *will have to obtain the consent of their wives and complete other necessary procedures, but first of all, a certain period of time will be consumed by the pre-requisite shares transfer deal. Therefore, a pledge transaction between legal entities will be more transparent for you, because…BTR owns the share from the DAY OF INCORPORATION, it wasn't acquired, and therefore its right of property is undisputable."*

I agreed to this, but it was clear and I was also informed that Mr. Dementyev was dealing with Mr. Belyak and Mr. Rempel as the principals behind the "BTR Group" as defined by the February 2010 agreement (*"…means I.G. Rempel, M.B. Belyak, as well as individuals and legal entities controlled by them"*).

26. In an email exchange between myself and Mr. Dementyev between September 4 to 6, 2013, which is attached together with its English translation as **Exhibit 6,** there was further discussion of additional security for a further loan of US$20 million and personal guarantees that Mr. Belyak and Mr. Rempel were said to be ready to provide (the offer to which I referred above). Again, Mr. Belyak and Mr. Rempel portrayed themselves as principals (Mr.

Dementyev also portrayed them in the same way) and I treated them as such, whether I dealt with them directly or through Mr. Dementyev.

27. I corresponded with Mr. Dementyev between March 18 to 20, 2014 regarding further loans totalling US$ 10 million. Mr. Dementyev asked whether I wished to see Prosperity LLC (**"Prosperity"**, the Russian company developing a shopping mall in Mytischi) as borrower or whether I preferred *"the proven scheme with BTR Cyprus"*. The fact that I was offered a choice of borrower clearly suggested that Mr. Belyak and Mr. Rempel control each entity. I replied that I wished Prosperity to be the borrower but that this was a matter to be further discussed with my legal advisors. I also said that personal guarantees would not be satisfactory as Mr. Belyak and Mr. Rempel were already guaranteeing *"the other loan"*. The above email correspondence is hereto attached with its English translation as **Exhibit 7**. In the event, the further loan was made to BTR.

28. On September 23, 2014 Mr. Dementyev emailed me with regard to the following two topics.

(a) Concerning the request by Mr. Belyak and Mr. Rempel (obviously as the principals behind BTR, although through separate ownership vehicles) for a postponement of its interest payment under the existing loan agreements until the end of the year.

(b) A proposed loan of US$ 240 million secured on the property of Prosperity which was stated in the attached spreadsheet to be owned by Kendalmac. In the discussions that I had had with Mr. Belyak and Mr. Rempel (referred to in Mr. Dementyev's paragraph 1), they had informed me that they were the indirect owners and controllers of Prosperity and therefore they had the power and the right to grant me or Lake Holding a pledge to secure lending of US$ 240 million. In any event, their approach to ownership is consistent with and confirmed by the

11

definition of "BTR Group" in the February 2010 agreement. Yet again, they

proclaimed themselves to be the owners of everything within their empire.

I attach copies of the email dated September 23, 2014 with the spreadsheet referred to above

with their English translations as **Exhibit 8.** The spreadsheet shows that the chain of

ownership could be changed by Mr. Belyak and Mr. Rempel at will. The sheet stated: *"At*

*the moment 100% of equity in Prosperity LLC is owned by Kendalmac BVI".* The use of

these words in a document coming from them is significant:

> (a) it shows ownership and control by Mr. Belyak and Mr. Rempel; and
>
> (b) the use of the qualifying words *"at the moment"* shows that the chain of
>     ownership could be changed by them.

29. On September 30, 2014, BTR, Mr. Belyak and Mr. Rempel defaulted on their loan
and guarantee obligations. Mr. Dementyev emailed apologizing for the delay in making
interest payments. In an email dated December 24, 2014, he stated that "we" (obviously
referring to Mr. Belyak and Mr. Rempel) thought it made sense to extend the loan periods
and the pledge agreements. He also asked me to defer the payment of the accrued interest
until June 3, 2015. Mr. Dementyev emailed again on January 12, 2015, forwarding a copy of
the email of December 24, 2014 stating that this was at Mr. Rempel's request. I replied on the
same date essentially saying that I would be willing to agree extending the payments but only
on new terms and conditions. The above email exchange is attached with its English
translation as **Exhibit 9**.

30. In the next few weeks there were discussions with Mr. Belyak, Mr. Rempel and
others of alternative ways to address the economic problems facing BTR, Mr. Belyak and Mr.
Rempel. On February 21, 2015, Mr. Belyak, Mr. Rempel and I signed a one-page
handwritten memorandum (again, the first two signed as principals) a copy of which is hereto
attached with its English translation as **Exhibit 10**. This was intended to set out the terms of a

12

restructuring involving a loan for US$ 170 million secured on the Unimall centre belonging to Baltia Mall or property owned by Krasnogorsk Development LLC ("KD") – KD is also owned and controlled by Mr. Belyak and Mr. Rempel.

31. It was a condition of the restructuring that Mr. Belyak and Mr. Rempel had to reorganise their holdings so that **they individually became direct shareholders of KD or Baltia Mall within 6 months**, otherwise a penalty of US$ 10 million would be due from them. It goes without saying that, to be able to promise this, they had control over the entities and were acting as principals. In the event, the terms of the memorandum were not adhered to, but I did not enforce the US$ 10 million penalty. Instead, I agreed with Mr. Belyak and Mr. Rempel to consider other options.

32. In the meantime, on February 4, 2015, Lake Holding took steps to exercise its rights of security over 66.67% of Baltia Mall (at the contractually agreed value of US$ 60 million) and this reduced the debt to a lower – but still very substantial – level. As I already owned 33% of Baltia Mall personally, I assumed 100% control over the company.

33. **MFCVSSAR LLP was formed in Florida on March 30, 2015, the partners being Mr. Belyak, Anastasia and Margarita. As far as I can tell, Mr. Rempel had no involvement in this or the other transactions in Florida.**

34. On April 3, 2015, Mr. Dementyev sent me an email which is hereto attached with its English translation as **Exhibit 11**, enclosing a questionnaire for setting up partnership agreement. The questionnaire was dated March 30, 2015. I was informed by Mr. Belyak and Mr. Rempel that this document had been prepared by the law firm of Clifford Chance, Moscow, **instructed by them personally**. The intention was to investigate the formation of a partnership with me in order to compromise the liabilities. On the front sheet of the questionnaire, Mr. Belyak and Mr. Rempel are expressly referred to as the **"Continuing Partners"** and it was for discussion whether the New Partner would be Lake Holding or

13

myself.  For present purposes, I draw attention to section 2.1 on the first and second pages of the spreadsheet where the position of Mr. Belyak and Mr. Rempel (as principals) is stated as follows (I have added emphases):

> *Question for approval:*
>
> *How will Partners participate in the JV (directly as individuals/affiliated companies/in which jurisdiction)?* ***Can the agents of the Partners act as shareholders of the JV, for example relatives?***
>
> *Position of* ***Continuing Partners****:*
>
> *Previously the* ***Continuing Partners*** *intend to act through Pacato and Elianos (at the time of the transaction each of the companies will be owned in equal shares by the* ***Continuing Partners****, as part of 6-month re-organisation after the transaction replacement will be made for companies affiliated with the* ***Continuing Partners*** *at 25% of the authorised capital each, while it is possible to use the old holding companies by leaving them with one of the* ***Continuing Partners****. It is assumed that loans from the* ***Continuing Partners*** *will be assigned to their other companies or the Existing Partners will leave loans at former companies. A more detailed ownership structure is subject to approval with a view to the tax and financial implications for the* ***Continuing Partners****.*

What was clear me at the time and is clear from the terms of the questionnaire is that Mr. Belyak and Mr. Rempel were the owners and controllers of all the companies.  I also note the clear reference to agents and relatives – it has been the practice for both of them to use relatives to act as agents, nominees etc.

35.  **MFCVSSAR LLP purchased the CVS Property (as defined in paragraph [48] below).**

36. By emails dated May 21, 2015 to May 27, 2015, which are attached with their English translations as **Exhibit 12**, Mr. Dementyev, Vladislav Abramov ("**Mr. Abramov**" another person who worked for Mr. Belyak and Mr. Rempel) and I discussed, *inter alia*, the preferable jurisdiction for the intended arrangements being Cyprus and I expressed my readiness to move forward. It is to be noted that the preference for Cyprus was expressed by Mr. Belyak and Mr. Rempel through Mr. Dementyev and Mr. Abramov. Later on, it became apparent to me that much of Mr. Belyak's and Mr. Rempel's corporate empire was based in Cyprus as well as in the BVI.

37. On September 4, 2015, Mr. Belyak, Mr. Rempel, acting as principals, and I signed an Agreement of Intent ("**the September 2015 agreement**") a copy of which is attached with its English translation as **Exhibit 13** in relation to the assets and businesses of Prosperity and Mytischi Plaza Development LLC ("**MPD**"). These were Russian companies owning substantial real estate investments in Russia. Their ownership structures were manipulated over time, but they included companies in Cyprus and the BVI which Mr. Belyak and Mr. Rempel have individually owned and controlled. I exhibit later in this declaration, see **Exhibit 14** and paragraph 39, copies of a structure chart ("**Chart 0**") that was supplied to me by Mr. Belyak and Mr. Rempel in the Fall of 2015 which we discussed face to face and on which I made notes. Mr. Benaur also exhibits these documents. "Chart 0" shows the various Russian property-owning companies and the Cyprus and BVI structures (*inter alia*) sitting above them (and at the top, their alleged ownership by physical persons), all of which Mr. Belyak and Mr. Rempel told me that they each actually owned separately, as shown in the uppermost field.

38. The September 2015 agreement was valid until December 31, 2015. The key predicate for the agreement was that, whatever the formal arrangements, Mr. Belyak and Mr. Rempel were each stated in clause 1 to be in a position (by means of a company or

15

companies controlled by them) to transfer 75% of each of Prosperity and MPD to me or to a person designated by me. For the avoidance of any doubt, Mr. Belyak and Mr. Rempel informed me in the pre-agreement discussions that they owned and controlled these two companies.

39. I attach as **Exhibit 14** an organisational chart which was provided to me by Mr. Belyak and Mr. Rempel in the Fall of 2015, together with other pages to which I refer. The pages are as follows:

| | |
|---|---|
| **Page 1:** | This is the main chart showing holding structures sitting above real estate in Russia – the handwriting consists of my notes and my additions reflecting changes notified to me up to around the first quarter of 2018. |
| **Page 2:** | The same chart with handwritten English translations of the notes on page 1 by my personal assistant, Yuliya Mosiyenko (**"Ms Mosiyenko"**). |
| **Pages 3 to 4:** | Additional information has been added by Lake Holding's international legal team relating to the ownership structure above Mytischi-Plaza-Development, including Carmen. |
| **Pages 5 to 6:** | The text, in English and Russian, of the contents of the uppermost and lowest boxes shown on pages 1 to 4. |
| **Pages 7 to 8:** | Typed fair copies and Ms. Mosiyenko's handwritten translations of my notes at the top left hand corner of the reverse of page 1 which are based on the information in the chart and what Mr. Belyak and Mr. Rempel told me. |

40. Working from the bottom of pages 1 to 4, the first level of companies are Russian and, above those, there are Cypriot, BVI and Belize companies. At the top level there are

references to individuals. There are direct references to Mr. Belyak and Mr. Rempel, as well as to Dmitry Kim (an associate of Mr. Rempel), Artem Eranov and Grigory Kochergin (Mr. Belyak's nephews) and Yulia Rempel (Mr. Rempel's wife) all of whom, Lake Holding asserts, are nominees for the two principals.

41. The importance of **Exhibit 14** is that it shows Mr. Belyak and Mr. Rempel operating on a truly worldwide basis. However, whilst they cooperated in their business activities, each had separate holding structures to facilitate their participation and ultimate **separate** ownership. This is evident from the charts and other information with them.

42. Summarising the position in 2015, I was actively negotiating with Mr. Belyak and Mr. Rempel about acquiring 75% of Prosperity and that is what the contemplated deal was principally going to be about. It was not an ideal solution, but I was prepared to accept it and it got Mr. Belyak and Mr. Rempel out of the financial problems they were in. However, the deal failed and was not completed before the year end because:

> (a) Mr. Belyak and Mr. Rempel did not re-organise their ownership structures in time. This was required by the route map for the transaction prepared by Clifford Chance, Moscow.

> (b) During the preparations, I was constantly being told by my lawyer that Mr. Belyak and Mr. Rempel did not seem to be in a hurry. Their behaviour allowed the agreement to expire.

> (c) In mid-December 2015, I received an email from Mr. Pilyugin (one of my Russian attorneys) by which he informed me that the closing was impossible in 2015 due to some technical reasons brought about by my counterparts' non-fulfilment of their obligations (our September 2015 agreement was expiring on 31 December 2015). Upon receipt of that message, I decided that I would not speed things up and extend the term of the agreement. I told that to Mr. Belyak

and Mr. Rempel in a telephone conversation. And besides, the economic situation in Russia worsened, and the deal on the agreed terms lost *the remains* of its appeal to me.

43. Whilst the September 2015 agreement was still theoretically "alive", on October 2, 2015, I received an email from Mr. Abramov enclosing 8 charts on paper bearing the "Red Whale" logo (the logo of one of Mr. Belyak's and Mr. Rempel's malls) and a memorandum from Clifford Chance, Moscow. I attach Mr. Abramov's email and copies of the charts and memorandum with their English translations as **Exhibit 15**. The email stated that *"Attached are the transaction documents approved by the lawyers."* The timetable was stated to be 2 months. For present purposes, it is important to note the pervasive presence of Mr. Belyak and Mr. Rempel as those in control of their "empire"; this was very clearly disclosed in the documents.

44. I was told that Mr. Belyak and Mr. Rempel, or others on their behalf and at their direction, had prepared the "Red Whale" charts, which show:

> (a) Kendalmac (of the BVI) as the sole shareholder of Prosperity and Pacato Limited (**"Pacato"** – of Cyprus) as the sole shareholder of MPD.
>
> (b) Parties 2 and 3 (confirmed by Mr. Belyak and Mr. Rempel and others as being themselves) are shown as owners of Kendalmac (and thus Prosperity) and Pacato (and thus of MPD).
>
> (c) Furthermore, the questionnaire dated March 30, 2015 (see **Exhibit 11** paragraph 34 above) illustrates Mr. Belyak and Mr. Rempel acting through entities and thus owning and controlling Mytischi Plaza LLC (**"MP"** – owning another collection of Russian real estate investments) and MPD.
>
> (d) Chart 7 shows the "UBOs" (Mr. Belyak and Mr. Rempel) liquidating the "Independent Entities".

18

(e) Chart 8 shows two persons (Mr. Belyak and Mr. Rempel) **owning 12.5% each** of Prosperity and MPD with myself owning 75%.

(f) The Clifford Chance memorandum (see also in **Exhibit 15**) is consistent with the 8 Red Whale charts, see, for example, paragraph 2 stating that Parties 2 and 3 (Mr. Belyak and Mr. Rempel) "or their affiliates" are the UBOs of Kendalmac and also the UBOs of Pacato, and paragraph 12 in which it is said that Kendalmac (or that company and Pacato) will, upon BTR's instruction, make partial loan repayment Lake Holding. The use of the words "or their affiliates" demonstrates the fact that Mr. Belyak and Mr. Rempel acted through others as wells as individually.

45. On October 12, 2015 Mr Dementyev sent an email which is attached with its English translation as **Exhibit 16**, stating that Mr. Abramov had received approvals of the transaction structure and the step by step plan from "all parties". He said that my lawyer, namely Mr. Sidorov, had not received instructions. However, I have already explained above the reasons why the September 2015 agreement expired.

46. On December 7, 2015, Mr. Belyak and Mr. Rempel sent me a memorandum in their joint names a copy of which is hereto attached with its English translation as **Exhibit 17**. They claimed to have completed the preparations to be ready to enter the final stage of the transaction and they complained that their engagement agreement with Clifford Chance, Moscow, was expiring and that delay would cost them more in fees. What is important is that this statement by the two principals confirms all that has been said about their dominant position controlling all the relevant entities, their structures and what they did.

47. Although Mr. Belyak and Mr. Rempel will dispute this, the statements made by them referred to above, were merely self-serving. On December 23, 2015, I sent an email to Mr. Rempel which includes a copy of a note prepared by my lawyer; this is attached with its

19

English translation as **Exhibit 18**). The note explained that neither of Mr. Belyak and Mr. Rempel had carried out the required reorganisation and, because other matters had not been attended to, closing the deal in 2015 was not possible. There were no attempts to revive the September 2015 agreement between the end of 2015 and the end of 2016 but other proposals and structures were considered.

48. **MB Wall LLC was incorporated on March 10, 2016, with Anastasia and Margarita as the ostensible shareholders.**

49. On March 22, 2016, Mr. Dementyev sent me an email to which a copy of a letter signed by P.V. Barovinskiy (**"Mr. Barovinskiy"**), a director of BTR, was attached. This explained how economic conditions had adversely affected the company and asked for the interest rate to be discounted. I attach the email with its English translation as **Exhibit 19**. I replied on the same day saying that there were problems other than the loan interest rates although I remained an adherent of a peaceful and mutually beneficial solution. It is the Lake Holding's position that BTR, Mr. Belyak and Mr. Rempel could all have made much better efforts to repay a substantial amount of the borrowing and I have now discovered that Mr. Belyak and Mr. Rempel have both lied about the extent of their assets, especially assets abroad – and, in Mr. Belyak's case especially, about the real estate in Florida – indeed, on the basis of current information, he appears to have the largest amount of assets outside Russia, measured by value. In various oral discussions between 2014 and 2019, Mr. Belyak and Mr. Rempel informed me that BTR and they did not have the assets – apart from some land plots in Moscow Region that are currently parts of their respective matrimonial asset severance proceedings – to repay the debt to Lake Holding. Contrary to these lies, Mr. Belyak and Mr. Rempel certainly did have assets. As we now know, in 2015 and 2016 real estate assets in Florida worth at least US$ 22 million were purchased by the Belyak family.

20

50. **On March 24, 2016, MB Wall LLC purchased the Walgreens Property as defined in paragraph 56(f) below.**

51. During 2015 and 2016, BTR was still servicing the loans by making occasional payments. At the end of 2015 and into 2016 there were meetings from time to time to discuss the situation that came about as a result of the failed September 2015 agreement. Mr. Belyak and Mr. Rempel as principals, mostly through Mr. Dementyev, suggested various restructuring options, and one of them later became the basis of a settlement reached on April 26, 2017. There were personal meetings and telephone conversations. After that had gone on for a while, I realized I could not delay the issue of legal proceedings any longer because, in accordance with the Russian legislation, there were time limitations on filing claims. Thus, Lake Holding initiated the Russian court proceedings against BTR, Mr. Belyak and Mr. Rempel in December 2016.

52. Between December 2016 and April 2017, there were discussion leading to the settlement with BTR, Mr. Belyak, Mr. Rempel and two companies owning Prosperity (Callison under the control of Anastasia for Mr. Belyak – and Rayvin under the control of Garri for Mr. Rempel) who agreed to provide security over shares in that company. The settlement was dated April 26, 2017 ("**the April 26, 2017 settlement**"). Unfortunately, it was not honoured by BTR, Mr. Belyak and Mr. Rempel or the owners of the shares in Prosperity (who became Anastasia and Garri after April 2017, following Callison and Rayvin respectively). Nor did Mr. Belyak and Mr. Rempel honour **the separate settlements reached with them personally on October 5 and 18, 2017** respectively, by which they agreed to perform the April 26, 2017 settlement.

53. **MB PDT 1901 LLC was incorporated on November 30, 2016 with Anastasia and Margarita as the ostensible shareholders.**

21

54. **On December 14, 2016, MB PDT 1901 LLC purchased the Porsche Design Tower Miami Property as defined in paragraph 56(h) below.**

55. For the reasons stated above, I do not continue the historical account save to say that:

(a) the Russian proceedings were pursued and resulted in the Russian Judgments (which Mr. Belyak has not denied) which have now been domesticated in the judgment issued on October 6, 2020;

(b) it is to be noted that BTR, Mr. Belyak and Mr, Rempel were pursued in court in Russia in **entirely separate proceedings**, resulting in **separate judgments** – yet another reason why Mr. Rempel has no place in the Florida litigation; and

(c) At meetings between me and Mr. Belyak in Monaco and Moscow during the period 2016 to 2017, he sought to convince me that "...*we are not scammers, it's just that the situation is that now we do not pay, but we will seek ways to return the debts....it's not we who created the crisis – it's force majeure......*" but, when I pointed out to Mr. Belyak that he did or must have some financial resources to make some payments, he replied "*Not now – a little later.*" This was a gross misrepresentation. Mr. Belyak was simply playing for time and dishonestly failed to make any meaningful attempt at repayment, whilst hiding the assets which had been acquired in the state of Florida. Lake Holding's meagre recoveries to date from Mr. Belyak and Mr. Rempel have been made through the Court's enforcement processes, e.g. mandatory deduction from Mr. Rempel's salary and Mr. Belyak's pension and whatever his "official" income is stated to be; see the letter from the RFBS dated August 5, 2020 referred to and exhibited below. As emphasised in paragraph 4 above, I mention this because I submit that the Court should have regard to the Belyaks' behaviour when weighing the evidence concerning ownership of the Florida real estate.

56.  I also stress that the following matters demonstrate Mr. Belyak's and his family's dishonest conduct (diverting funds which might have been used to satisfy liabilities under Mr. Belyak's guarantee and generally designed to deprive Lake Holding of the ability to recover the sums due to it):

> (a) On March 3, 2008, Mr. Belyak and his wife, Margarita Belyak (**"Margarita"**), had purchased 10295 Collins Avenue, Unit 1003, Bal Harbour, Florida 33154 (**"the Ritz Carlton Apartment"**) – the purchase was recorded on March 17, 2008.  Also on March 17, 2008, they transferred it to their daughter, Anastasia. Whilst this purchase was made before the loans were taken from Lake Holding in 2012, Mr. Belyak "pleaded poverty" in the period after the defaults of September 30, 2014 and he hid the existence of this property from me (see paragraph 49 above) and when questioned by the RFBS – see paragraphs 58 to 62 below.  I knew very generally from Mr. Belyak's comments that he had an apartment in Florida but I did not know when it was purchased, for how much and whether he still had it after September 2014.  I believe that this property may now be worth of the order of US$ 4 million.

> (b) Lake Holding's investigations uncovered at least US$ 22 million in Florida real estate purchases that Mr. Belyak, his wife and daughter secretly made in 2015 and 2016.

> (c) MFCVSSAR LLP was formed on March 30, 2015 (with Mr. Belyak, his wife and daughter being partners) and on, April 7, 2015, it secretly bought 4301 Bee Ridge Road, Sarasota, Florida 34233 (**"the CVS Property"**) for US$ 7.2 million.  This was within a relatively short time after the defaults of September 2014, a shorter time after the excuses presented to me about the defaults and an even shorter time after the signature of the document dated February 21,

2015 (see **Exhibit 10** paragraph 30 above). Furthermore, the questionnaire composed with a view to setting up a partnership (see **Exhibit 11** paragraph 34 above) was sent to me on April 3, 2015, only days before the CVS Property was bought.

(d) On March 10, 2016, MB Wall LLC was incorporated in Florida with Anastasia and Margarita as the ostensible shareholders.

(e) On March 22, 2016, BTR through Mr Barovinskiy, obviously with Mr. Belyak's and Mr. Rempel's authorization, wrote to Lake Holding the letter attached above as **Exhibit 19** (see paragraph 49) acknowledging the debt and representing that, due to a deterioration of the economic situation in Russia, and a dramatic increase of US Dollar value against the Russian Rouble, it was impossible to service the loans on the existing terms. BTR requested to discount the interest rate for all loan agreements to 5% (five per cent) p.a. as of January 1, 2016.

(f) On March 24, 2016 – just two days later – MB Wall LLC (allegedly co-owned by Mr. Belyak's wife and daughter, but this is challenged by Lake Holding) secretly bought 5180 W Irlo Bronson Memorial Parkway, Kissimmee, Florida (**"the Walgreens Property"**) for USD8.2 million.

(g) On November 30, 2016, MB PDT 1901 LLC was incorporated in Florida with Anastasia and Margarita as the ostensible shareholders.

(h) On December 14, 2016 and thereafter, Mr Dementyev sent various loan restructuring proposals to me. Later, similar proposals, led to the Settlement Agreement dated April 26, 2017 referred to above. Mr. Belyak and the other Belyak Defendants concealed that on this same day MB PDT 1901 LLC, also

supposedly co-owned by Margarita and Anastasia, bought the Porsche Design
Tower Miami Property for US$ 6.7 million.

57.  In this section of the declaration I simply make general reference to steps being
taken against Mr. Belyak in Monaco.  This is not a complete catalogue. None of the
executions in Monaco has been completed and no funds have therefore been received by
Lake Holding.  For example, steps have been taken in respect of:

(a) a bank account holding a small balance;

(b) a Rolls-Royce motor car (not the same Rolls-Royce motor car – kept at what is
said to be Anastasia's apartment in Florida – which Mr. Belyak transferred in
Florida to Leonid Belfour on November 14, 2019 in breach of the TRO granted by
Judge Huck in Federal Court on November 13, 2019).

Mr Belyak and his wife have, to my personal knowledge, had a residence in Monaco for
many years.  Margarita has a Monaco resident's card; see the attached copy in **Exhibit 20**
which also contains documents disclosed in the BVI in relation to Carmen Management
Limited which show that she has a residence at 31 Avenue Princesse Grace in Monaco; see
further papers **Exhibit 20.**

58.  Mr. Belyak has lied to or failed to comply with the requirements of the RFBS on
many occasions and has actively tried to mislead the RFBS in relation to the true extent and
location of their assets.  In particular Mr. Belyak has lied to the RFBS about the extent of his
assets and has denied having any assets outside the Russian Federation. He has made no
reference to his Monaco or US assets.  He also made untruthful statements about his wife's
and daughter's assets, including their interests in offshore companies in the BVI and Cyprus.
Nothing was said about the real estate assets and the Rolls Royce in Florida or the residence
in Monaco and its contents or his bank account there. I hereto attach as **Exhibit 21** a copy of
Mr. Belyak's signed statement dated September 26, 2019 together with a copy of the RFBS'

letter dated September 19, 2019 reporting on further untruthful statements made by him in 2018, with their English translations.

59. Defendant Belyak acknowledged the debt that he owed in his recent interview with RFBS. To the question *"How did your debt to LAKE HOLDING AND FINANCE S.A. arise?"*, he answered *"I am the guarantor under the loan of BTR BUILD TO RENT GROUP. This loan was obtained in 2012 for the construction of the Red Whale Shopping Mall in Krasnogorsk. Subsequently, the shopping mall was built. In 2014, I partially guaranteed the repayment of the loan. The loan was not repaid in full due to the fact that the loan agreement was concluded in US Dollars at the 2012 exchange rate. After a sharp change in the exchange rate, repayment of the loan became impossible."*

60. On June 27, 2018, Defendant Belyak was interviewed by the RFBS and the following questions and manifestly dishonest answers (*inter alia*) were recorded:

> Question: *Do you own any property, including outside the Russian Federation?*
> Answer: *No, I do not, except for vehicles: Mercedes 200 and Toyota Land Cruiser 200.*
>
> **[Misrepresentation: He has driven and probably owns a Rolls Royce in Miami.]**
> Question: *How do you plan to repay the debt?*
>
> Answer: *I am negotiating with contractors for the acquisition of property that can be used in settlements with the collector. I will provide detailed explanations in response to the request dated June 26, 2018.* **[Defendant Belyak never did this.]**
> Question: *When was the last time you were abroad?*
>
> Answer: *About a month ago I was in France, in Monaco, negotiating on the issue of my debt.*
> Question: *Have you tried to somehow settle your relationship with Lake Holding & Finance S.A.?*

Answer: *Yes repeatedly.....*

61. On September 26, 2019, Defendant Belyak was interviewed again by the RFBS and the following questions and answers (inter alia) were recorded in an official document which he signed:

Question: *Do you....possess movable or immovable properties abroad?*

Answer: *I do not possess movable or immovable properties abroad.* **[False: he is a partner in MFCVSSAR LLP, which owns the CVS Property in Sarasota, Florida, and , without prejudice to Lake Holding's other arguments, he is entitled as a spouse under Russian law to half of Margarita's shares in MB Wall LLC and MB PDT 1901 LLC]**

Question: *Does your wife....possess moveable or immovable properties outside of the Russian Federation?*

Answer: *She does not possess any movable or immovable properties outside of the Russian Federation.* **[False: see above re MB Wall LLC, MB PDT 1901 LLC, MFCVSSAR LLP, the Walgreens Property, the CVS Property, the Porsche Design Tower Miami Property]**

Question: *Do your daughters (Marina and Anastasia) possess movable or immovable properties outside the Russian Federation?*

Answer: *I do not know.* **[False: see above re Ritz Carlton Property and all the other properties in Florida]**

62. Clearly, Mr. Belyak did and does know, but lied and concealed for years, that Anastasia owned the Ritz Carlton apartment that he bought and gifted to her in 2008 and where he registered his Rolls Royce. He also knew, but concealed, for example, that that his wife and daughter owned the Porsche Design Tower Miami Property through MB PDT

1901 LLC, and that he therefore owned (at the least) half of Margarita's shares in that company.

63.    Mr. Rempel was also interviewed by and lied to the RFBS – this is addressed in my Cyprus affidavit. *See* para 152 at Dkt. No. 51.

64.    With regard to BTR, on October 14, 2019 the RFBS interviewed Mr. Barovinskiy, director of the company from January 1, 2012 to June 26, 2017 (to whom I have referred above). His replies are written in the minutes of the interview a copy of which is attached with its English translation as **Exhibit 22** and included the following remarks which were very strange coming from a director given that he was supposed to have knowledge of the affairs of BTR:

> (i)    Mr. Barovinskiy did not remember who appointed him a director, even though he had held the position for over 5 years.

> (ii)   He admitted being a director when the US$90 million loan from Lake Holding was contracted but he denied dealing with the funds or knowing how they were dealt with. This makes no sense in view of the terms of his letter of March 22, 2016 referred to above (see paragraph 49 and **Exhibit 19**).

> (iii)  He denied knowing that Mr. Belyak and Mr. Rempel were owners of BTR. This is very strange in view of the definition of "BTR Group" in the February 2010 Agreement. Furthermore, in this and other answers, he was effectively denying knowledge of BTR's affairs. This is absurd given that he wrote the letter of March 22, 2016 and signed the April 26, 2017 Settlement on behalf of BTR.

> (iv)   Mr. Barovinskiy denied receiving instructions from Mr. Belyak and Mr. Rempel. Lake Holding maintains that he was instructed by Mr.

Belyak and Mr. Rempel at least to write the letter of March 22, 2016 and also to sign the April 26, 2017 Settlement. The matters contained in Mr. Benaur's declaration show that Mr. Barovinskiy was involved in numerous matters on behalf of Mr. Belyak and Mr. Rempel.

(v)     He denied knowing the whereabouts of the records of BTR, an extraordinary statement coming from a director. To the best of my belief, this reinforces the case that it is Mr. Belyak (and Mr. Rempel) who are in control of BTR – and this dominance (and the other matters to which I have referred) should be taken into account when assessing the evidence as to the ownership of the Florida real estate.

65.  I next address the state of indebtedness due to Lake Holding and developments in the asset division proceedings between Mr. Belyak and Margarita. Mr. Benaur has exhibited a copy of a letter from RFBS dated August 5, 2020 setting out the amounts due from BTR, Mr. Belyak and Mr. Rempel. For ease of reference, I attach a further copy of this short document (in English and Russian) **as Exhibit 23.**

66.  BTR – security:  The certificate from RFBS dated 5 August 2020 refers in general terms to amounts realised from security. The following are the realisations of security from the pledged assets of Greentrade and Megatex:

(a)  Greentrade assets: RUB 17,555,555 (@ exchange rate 1/78 = approx. US$ 225,071.21).

(b)  Megatex assets: RUB 46,000,100 (@ exchange rate 1/78 = approx. US$ 589,744.87) These sums are taken into account by RFBS even though not stated on the face of the letter of August 5, 2020. The funds are on the RFBS's account and have not yet been transferred to Lake Holding.

67. BTR - interest claim:  Lake Holding was awarded a judgment against BTR for statutory interest of US$ 6,429,045.48 on March 6, 2020.  BTR's first appeal was rejected on July 2, 2020.  BTR filed a Cassation appeal on September 8, 2020.  The hearing will take place on November 18, 2020.

68. Belyak - asset division:  The Belyaks are not in fact divorced and I do not believe that they are even separated – although Mr. Belyak is currently not allowed to leave Russia and Margarita appears to spend a substantial amount of time in Monaco – I see her in the street from time to time.  Lake Holding intervened in the asset division proceedings to object to the nature of the division.  The Belyaks won at first interest and on appeal and Lake Holding has 3 months from the publication of the decision (made on September 16, 2020 but not yet published) to file a Cassation appeal.  There is not, in fact, much at stake:

(a) The Belyaks divided the assets for a total amount of RUB 319,007,180 (approx. US$ 4,089,835.64).  Mr. Belyak received RUB 173,394,180 (approx. US$ 2,223,002.30).  Margarita Belyak received RUB 154,613,000 (approx. US$ 1,866,833.33).  All the values and who gets what are as proposed by the Belyaks.

(b) What Mr. Belyak has can be roughly divided into two classes: Sevastopol assets and land plots.  The Sevastopol assets are liquid and have more or less known real market values and they can be realized once the current stay is lifted.  I roughly estimate the Sevastopol assets to be worth RUB 29 million (approx. US$ 371,794.87).

(c) The rest of the assets (land plots) are of very dubious market value and liquidity and are definitely not worth RUB 144 million (as suggested).  Besides, their realization will be a lengthy process, which might take up to 2 to 2.5 years to complete.

I stated in my affidavit sworn in Cyprus on March 10, 2020 that Mr. Belyak has falsely stated that the sole purpose of the asset division agreement was to allow him to become the sole owner of part of the common property in order to be able to repay his debts.  *See* Docket No.

51 para 150. The agreement made no mention of assets outside Russia, notably the Florida real estate, nor was there any mention of shareholdings in companies incorporated outside Russia, for example Carmen Management Limited which Mr. Benaur addresses in paragraphs 40 to 41 of his declaration. Above all, there is no evidence of Mr. Belyak attempting to repay his debts – instead he appears to be spending large sums on legal fees in Cyprus, Monaco and the USA in attempts to evade his liabilities.

69. Rempel - asset division: The Rempels are not divorced but they separated in 2018. There are separate asset division proceedings which only concern assets within Russia and they are not relevant to these proceedings.

70. Finally, I mention that I live in Monaco for a large part of the year and, when I am there, I often see Margarita who lives in an apartment on the highly fashionable Avenue Princesse Grace (often also occupied by Anastasia and previously by Mr. Belyak when he was free to leave Russia) and drives an Aston Martin motor car[2]. I met her relatively recently when I was walking my dog along Avenue Princesse Grace. She asked me why I was attacking them (meaning the family, I assume). I replied that I have no choice as Mr. Belyak is putting Margarita and Anastasia up as "fronts" – nominees. She said no more and neither did I.

Under penalties of perjury, I declare that I have read the foregoing Declaration and a true Russian translation thereof (attached hereto as **Exhibit 24**) prepared by the agency in Moscow called "Project Translations" which has been verified to me by my personal assistant, Ms. Yuliya Mosiyenko (who is fluent in English and Russian and who holds a degree in English Language Interpreting from the Azerbaijan State University of Languages),

---

[2] Mr. Belyak has also had two Rolls-Royce motor cars – one in Florida and one in Monaco.

and that the facts stated in it are true.

Executed on October 21, 2020

By:   Vladimir Vasilyevich Melnichenko, as
       Owner of Lake Holding & Finance S.A.

_____

40 to 41 of his declaration. Above all, there is no evidence of Mr. Belyak attempting to repay his debts – instead he appears to be spending large sums on legal fees in Cyprus, Monaco and the USA in attempts to evade his liabilities.

69. Rempel - asset division: The Rempels are not divorced but they separated in 2018. There are separate asset division proceedings which only concern assets within Russia and they are not relevant to these proceedings.

70. Finally, I mention that I live in Monaco for a large part of the year and, when I am there, I often see Margarita who lives in an apartment on the highly fashionable Avenue Princesse Grace (often also occupied by Anastasia and previously by Mr. Belyak when he was free to leave Russia) and drives an Aston Martin motor car[2]. I met her relatively recently when I was walking my dog along Avenue Princesse Grace. She asked me why I was attacking them (meaning the family, I assume). I replied that I have no choice as Mr. Belyak is putting Margarita and Anastasia up as "fronts" – nominees. She said no more and neither did I.

Under penalties of perjury, I declare that I have read the foregoing Declaration and a true Russian translation thereof (attached hereto as **Exhibit 24**) prepared by the agency in Moscow called "Project Translations" which has been verified to me by my personal assistant, Ms. Yuliya Mosiyenko (who is fluent in English and Russian and who holds a degree in English Language Interpreting from the Azerbaijan State University of Languages),

and that the facts stated in it are true.

Executed on October 21, 2020

By:    Vladimir Vasilyevich Melnichenko, as
       Owner of Lake Holding & Finance S.A.

---

[2] Mr. Belyak has also had two Rolls-Royce motor cars – one in Florida and one in Monaco.